# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Coatesville Area School District     :
    :
          v.            :    No. 1313 C.D. 2022
    :    Argued: December 6, 2023
Chester County Board of Assessment    :
Appeals and Preserve at Milltown     :
Lantern Owner LLC     :
    :
Appeal of: Preserve at Milltown     :
Lantern Owner LLC     :

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, President Judge
                   HONORABLE PATRICIA A. McCULLOUGH, Judge
                   HONORABLE ANNE E. COVEY, Judge
                   HONORABLE MICHAEL H. WOJCIK, Judge
                   HONORABLE ELLEN CEISLER, Judge
                   HONORABLE LORI A. DUMAS, Judge
                   HONORABLE STACY WALLACE, Judge

OPINION BY
PRESIDENT JUDGE COHN JUBELIRER     FILED: August 15, 2024

This case requires us to consider three questions. First, is a school district's use of a facially property-type-neutral monetary threshold in an effort to choose the most cost-effective properties for tax assessment appeals a per se violation of article VIII, section 1 of the Pennsylvania Constitution, PA. CONST. art. VIII, § 1 (Uniformity Clause)? Second, did Coatesville Area School District (CASD) violate the Uniformity Clause through its implementation of a policy containing an otherwise neutral monetary threshold (Policy) because it resulted in no appeals of residential properties? And finally, was CASD's process of selecting properties for appeal arbitrary? Consistent with this Court's prior cases, use of monetary

thresholds does not per se violate the Uniformity Clause. Further, discerning no Uniformity Clause violation in CASD's implementation of the Policy, we affirm the Court of Common Pleas of Chester County's (common pleas) Order granting CASD's tax assessment appeal.

## I.    BACKGROUND

The Preserve at Milltown Lantern Owner LLC (Taxpayer) owns an apartment complex located in Caln Township, Chester County, known as the Preserve at Milltown (Property). (Common pleas' opinion issued pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a) (common pleas' op.) at 1.)[1] CASD initiated a tax assessment appeal of the Property, and the Chester County Board of Assessment Appeals (Board) denied the appeal, issuing a Notice of No Change in Assessment to Taxpayer on October 18, 2019. (Reproduced Record (R.R.) at 12a.) CASD appealed the Board's decision to common pleas, asserting that the Property's approximately $8 million assessed value was too low. (*Id.* at 13a-14a.) In its answer and new matter, Taxpayer argued that CASD's appeal of the Property's assessed value violated the Uniformity Clause. (Common pleas' op. at 1-2.) Common pleas held a *de novo* trial on October 13, 2022. (*Id.* at 2.) Notably, the valuation of the Property was not at issue, as the parties stipulated to the Property's fair market value and assessed value, which for 2020 were $49,500,000 and $24,403,500, respectively. (R.R. at 25a.)[2]

---

[1] Common pleas' Pa.R.A.P. 1925(a) opinion can be found at page 416a of the Reproduced Record.

[2] Counties using the base-year method compute property tax as follows. First, in a countywide reassessment year, the property is assigned its fair market value. Then, to reach the assessed value of the property, the fair market value is multiplied by the predetermined ratio. **(Footnote continued on next page…)**

2

*A. Proceedings Before Common Pleas*

Taxpayer first called Charles Linderman as on cross-examination. Linderman testified that he began working for Great Valley School District (Great Valley) in 1981, where he worked for 38 years, and from which he retired in 2019. (R.R. at 34a.) For the majority of his career, he served as a school district business administrator, and, in that capacity, he initiated tax assessment appeals. (*Id.* at 35a.) From March through July 2019, he served as acting business manager, or consultant, to CASD. (*Id.* at 36a.) He presented the idea of CASD initiating its own assessment appeals, as CASD had never done so before. (*Id*. at 38a.) The purpose of the tax assessment appeals was to generate revenue. (*Id*. at 39a.) Linderman testified that he presented the idea of a tax assessment appeal program involving a monetary threshold to the school board in April 2019. (*Id.* at 40a.) He acknowledged that the idea of a $10,000 monetary threshold derived from the notion that the program

---

Section 8842(a) of the Consolidated County Assessment Law (Law), 53 Pa.C.S. § 8842(a). The assessed value is multiplied by the county's millage rate to determine amount due.

> Under a base[-]year system of valuation, a county performs a countywide reassessment of all real property in the base year, and then uses each property's base[-]year assessment as that property's basis for taxation in the base year, as well as its basis (i.e., assessed value) in subsequent years. . . . In the base year, a property's assessed value may be 100% of its actual value, and thus, assessments of all real estate in the county are based on actual, fair market value for the base year. Each year thereafter, however, a given property's market value may change, but its assessment ordinarily remains static, fixed at its base[-]year level until the next countywide reassessment. . . . This is so because a county utilizing a base[-]year method of valuation typically does not consider market fluctuations subsequent to the base year when assessing "current value," or factor in variables such as improvements to a property that may increase its assessed value. If a building is constructed on a lot that was vacant during the base year, the property's assessed value is determined by using either sales of comparable properties in the base year or base[-]year construction schedules.

*Clifton v. Allegheny County*, 969 A.2d 1197, 1203 (Pa. 2009) (footnote and citations omitted).

3

needed to be manageable with respect to attorney and consultant time; the monetary threshold would ensure selection of only those properties for appeal that would be worth CASD's time and money. (*Id.* at 41a-42a.) He also testified that CASD did not have the "bandwidth" to appeal every assessment that would generate $10,000 in revenue. (*Id.* at 42a.) Linderman noted that "fiscal responsibility" required "cost[-]benefit analysis." (*Id.* at 42a-43a.)

Linderman testified that he selected a monetary threshold of $10,000 based on his prior experience working with Great Valley, which he testified also had a limitation of 10-15 properties. (*Id.* at 43a-44a.) Linderman testified that he told the CASD school board that the assessment appeals would only impact commercial and high-end residential properties. (*Id.* at 46a-47a.) He also testified that the list of properties he forwarded to the superintendent for consideration in June 2019 were all commercial properties. (*Id.* at 63a-64a.) He acknowledged that he had described certain types of properties, like convenience stores, as "low hanging fruit" for assessment appeal purposes because they were, in his experience, underassessed. (*Id.* at 66a.)

Linderman and Taxpayer's attorney had the following exchange:

Q: . . . . Other than a school district[-]initiated tax assessment appeal, there[ are] other ways to raise revenue, correct?

A: Correct.

Q: There could have been a county[]wide reassessment, right? . . .

A: Yeah, and it might snow tomorrow, but, yes.

Q: Understood. I think we talked about it being a great equalizer. It could actually snow tomorrow. It's pretty cold out there. The county[]wide reassessments . . . would be the great equalizer, right?

A: It usually is for a couple years.

Q: . . . . [T]he last [reassessment] was in 1998; is that fair?

4

A:  I believe they valued everything in '96 and it became effective in '98.

Q:  We talked a little bit in your deposition about why it wasn't done more frequently, and I believe you told me there's some politics involved, fair?

A:  That's absolutely fair.

(*Id.* at 69a-70a.)

Also admitted into evidence and played for the court were videos and transcripts of Linderman's comments on two occasions before CASD's school board, once on May 14, 2019, and the other on June 15, 2019.  (*Id.* at 56a-57a, 62a, 246a-48a.)  At the May 14 meeting, Linderman explained:

> You have to do residential along with commercial[;] there was a case called *Valley Forge* [*Towers Apartments N, LP v. Upper Merion Area School District*, 163 A.3d 962 (Pa. 2017) (*Valley Forge Towers*),] [] not too long ago that require[s] it, but you're really going to be looking at the very high[-]end residential, not the low end, it'll be . . . most people that you're talking about will not even have to think about it.

(*Id.* at 246a.)  He explained that practically, "a $10,000 increase . . . to your property tax" means that "if you're paying $4,000 now, that's a lot of money to pay, we have to say that your tax bill should be $14,000."  (*Id.*)  At the June 15 meeting, Linderman reiterated that the Policy would cause CASD "to be looking at the larger, commercial[,] and very large residential properties."  (*Id.* at 248a.)

Taxpayer then called Reaves Lukens, who confirmed that he served as a consultant to the school district in 2019.  (*Id.* at 72a-73a.)  Lukens testified that he complied with the $10,000 monetary threshold in identifying properties, and that he ultimately generated a list of 16 properties for appeal.  (*Id.* at 73a, 77a.)  Lukens responded in the affirmative to the following question from Taxpayer's attorney regarding the fact that he provided a list of 16, rather than 10-15 properties, to

CASD: "[i]n your words, your rational[e] was it's like a deli, give a customer a pickle, right?" (*Id.* at 78a.) Lukens agreed that the first step of the process was "to prepare a median sales price analysis for groups of recent sales of non-residential properties in the county[.]" (*Id.* at 80a.) Then, he grouped them by their land use codes and calculated median sales prices for each land use group. (*Id.*) Lukens confirmed that the next step is to "look[] for a potential increase in market value that would potentially hit the threshold for each of those properties, using that analysis[.]" (*Id.* at 83a.)

Lukens confirmed that the second step of the analysis involved sorting based on various other characteristics. (*Id.* at 85a-86a.) He also confirmed that on the spreadsheet there was a tab, the purpose of which was "to calculate the market value increase necessary for a property to hit the $10,000 threshold." (*Id.* at 86a.) That tab included 141 properties that met or exceeded the threshold, (*id.* at 93a), and from there, Lukens "performed a more in-depth review of some of th[ose] properties[,]" (*id.* at 94a). Lukens referred to the forum for culling the list of 141 down to the final list as a "conference table session," in which the team reviewed the properties by looking at online resources and photographs. (*Id.*) Lukens confirmed that he did not review "all of the 141 properties" from that list. (*Id.* at 94a-95a.)

Lukens testified that he "didn't go deliberately looking for Wawas[] [and] pharmacies" but rather "net leased properties" because they "don't fit into the county system very well [which has] historically missed the net lease real estate."[3] (*Id.* at 97a.) Lukens could not recall exactly what he did to review residential properties. (*Id.* at 98a.) He testified that generally, he would look at a multiple listing service (MLS) for recent sales to identify residential properties that may be underassessed.

---

[3] A net lease is "[a] lease in which the lessee pays rent plus property expenses (such as taxes and insurance)." *Lease*, BLACK'S LAW DICTIONARY (11th ed. 2019).

6

(*Id.* at 100a-01a.)  Further, he noted that Act 319[4] "Clean and Green" properties were generally excluded because they would not generate sufficient revenue.  (*Id.* at 100a, 103a.)

On cross-examination, Lukens explained that he **did look** at both **residential and commercial** properties because he "understood the rules of the road in assessment appeal[s] for school districts was that you consider all types of properties." (*Id.* at 112a.)  He explained the process in more detail with respect to **residential properties**, noting that he started with the MLS.

> I sat down at the computer.  I would have selected [CASD].  I would have selected a period of time, probably three to five years.  I would have checked the boxes sold, listed, I probably would have selected under contract, various ones that seem relevant.  I set a floor of, I think it was probably like $450,000 maybe $425,000, which basically said that the property had to have a value of 425 and an assessment of 0 to potentially meet the [] [P]olicy.  It then dropped a list of properties down, and I would go through them and mostly it was look at the sale price, look at the assessment.  At the time it was roughly a 50 percent ratio.  I'm not a math guy . . .  but I can times two in my head, see if it had merit.  If it did, I made a note of it, clicked it, onto the next one, and then I went through the entire list.  I suspect there were [Act] 319 properties that I had to double-check, and then that was the extent of the process really.

---

[4] Act of December 19, 1974, P.L. 973, No. 319, *as amended*, 72 P.S. §§ 5490.1-5490.13. Act 319 is also known as the Pennsylvania Farmland and Forest Land Assessment Act of 1974. According to the Pennsylvania Department of Agriculture,

> Clean and Green is a preferential tax assessment program[] that bases property taxes on use values rather than fair market values.  This ordinarily results in a tax savings for landowners.  The Pennsylvania General Assembly enacted the program in 1974 as a tool to encourage protection of the Commonwealth's valuable farmland, forestland and open spaces.  Currently, more than 9.3 million acres are enrolled statewide.

Pa. Dep't of Agriculture, Clean & Green, https://pa.gov/en/agencies/pda/plants-land-water/farmland-preservation/clean-and-green.html (last accessed August 14, 2024).

(*Id.* at 112a-13a.) Lukens expressed that it was impractical to employ the same methodology for residential properties as commercial properties. (*Id.* at 113a-14a.)

Common pleas next accepted Peter Angelides, Ph.D. (Dr. Angelides) as an expert in economics and statistics. (*Id.* at 127a.) He holds a Ph.D. in economics, as well as a master's degree in urban planning. (*Id.* at 119a.) Dr. Angelides testified that there are 23,793 properties in CASD, of which 19,524 were single-family residential properties in 2020. (*Id.* at 130a.) He concluded "that the $10,000 threshold is high enough that it effectively precludes the ability to appeal single-family properties." (*Id.* at 131a.) He agreed that approximately 82% of properties in CASD are residential, whereas only about 3% were apartments or commercial properties. (*Id.* at 135a-36a.) "The conclusion [is] that [CASD] disproportionately appealed commercial properties, whether you count by number of properties or by assessed value." (*Id.* at 136a.) He testified that CASD appealed 0% of residential, 5.6% of apartments, and 1.9% of other commercial. (*Id.* at 137a.) "[T]he $10,000 threshold effectively eliminates the potential to appeal single-family properties" because "very few, if any . . . single-family residential properties will qualify for appeal under the [P]olicy." (*Id.* at 137a-38a.) Dr. Angelides calculated that in order to meet the threshold in Caln Township, where the Property is located, the assessed value would have to increase by $214,460, which translates to a $435,000 market value increase. (*Id.* at 139a.)

According to Dr. Angelides, the residential property that came closest to satisfying the threshold would have generated about $7,500 of tax revenue. (*Id.* at 163a.) He explained that "there is no property identified in which the difference in property tax revenue satisfies [CASD's] threshold." (*Id.* at 164a.) On cross-examination, Dr. Angelides acknowledged that the threshold also would eliminate

some commercial properties from consideration. (*Id.* at 170a.) He also acknowledged that he used sales price as a proxy for fair market value, and that he did not use either the cost approach, the sales comparison approach, or the income approach to appraise the properties. (*Id*. at 171a.)

### B. *Common Pleas' Opinion*

Common pleas found the facts as follows in its Opinion:

By way of background, CASD is centered around the City of Coatesville. It is, at best, a financially struggling entity. In March[] 2019, CASD hired [] Linderman as its Acting Business Manager. [] Linderman previously served for thirty (30) years as the Business Manager for Great Valley . . . . He was brought on to assist CASD in preparing a budget.

Linderman testified at trial that CASD was financially challenged and needed to find revenue. Linderman was familiar with school district-initiated appeals from his time at Great Valley . . . . He was unaware of any CASD-initiated appeals prior to his tenure. After consultation with the then Superintendent of [CASD], he eventually presented the idea of district-initiated appeals to CASD's [s]chool [b]oard. Linderman testified that he recommended the [s]chool [b]oard consider a policy that would authorize an assessment appeal of **any** property so long as it would be a successful appeal producing at least $10,000 in revenue. He also advised that another important and practical consideration for the [s]chool [b]oard with regard to such appeals had to be CASD's ability to manage the number of selected appeals. Based upon his professional experience, he concluded that approximately 10-15 appeals per year would be "doable" for CASD. According to Linderman, CASD simply did not have the manpower to appeal every property.

Around May 10, 2019, CASD developed . . . [the Policy, which it called the] "District-Initiated Real Estate Tax Assessment Appeals" policy. The Policy provided authorization for CASD to "file assessment appeals related to properties within the [CASD] that may be under[]assessed so as to increase revenue and equity in the management of the district's tax base." ([R.R. at 251a.]) The Policy's guidelines or parameters for any appeal was as follows:

9

The identification of potential properties to be subject to a [CASD]-initiated real estate tax assessment appeal shall be consistent with the following guidelines.

1. The Director of Business Management may review recent real estate transactions to identify properties that may be under[]assessed.

2. The Director of Business Management may consult with the [CASD] solicitor or an independent appraisal/consulting firm to identify properties that may be under[]assessed.

3. The Director of Business [Management] may rely on guidance from the courts and statutory authorities to support the identification of properties in which a [CASD]-initiated assessment appeal may increase revenues based on reasonable financial consideration, including, but not limited to the cost to file and litigate the appeal and the value of the underlying property.

4. The properties recommended to the [school] [b]oard by the Director of Business Management to be the subject of a [CASD]-initiated real estate tax assessment appeal shall be under[]assessed to the extent that the Director of Business Management, in consultation with the [CASD] solicitor and independent appraisal/consulting firm, reasonably believes that the potential increase in total tax revenue to be collected in the aggregate by all taxing districts within [CASD] for the year to be appealed exceeds $10,000 in the event the appeal is successful.

(*Id.* at [252a.])

In summary, the Policy was a monetary-driven one. It was to be used to determine whether an appeal would result in enough revenue to make the litigation process cost effective for CASD. The identification of properties that might fall within the Policy was left to a professional, certified appraiser. Linderman testified that he did not otherwise interact with the consultants regarding which properties would be recommended for appeal.

On May 14, 2019, Linderman was present at a [s]chool [b]oard committee meeting at which the Policy was discussed. Linderman testified he advised adopting a policy that would select properties for

10

appeal based upon a monetary threshold. During the meeting, Linderman answered questions from committee members about the tax implication for residents. ([*Id.* at 246a.)] He acknowledged that the recommended threshold likely would result in appeals of "high-end" residential and commercial properties. (*Id.*)[] Thereafter, in July[] 2019, CASD adopted the Policy and approved the initiation of sixteen (16) tax appeals for properties within CASD, including [] Taxpayer's Property. ([*Id.* at 253a.)]

(Common pleas' op. at 2-4 (emphasis in original).)

Common pleas found that no Uniformity Clause violation had occurred because the Policy directs that all properties, **regardless of property type**, be considered. Further, common pleas observed that "[o]ther citizens of CASD are being taxed on the [fair market value] of their property as impacted by the [Common Level Ratio (]CLR[)]."[5] (Common pleas' November 14, 2022 Decision and Order (common pleas' decision and order) at 6.)[6] It continued that "[i]f CASD

---

[5] The Law defines CLR as

The ratio of assessed value to current market value used generally in the county and published by the State Tax Equalization Board [(STEB), established by the STEB Law, Act of June 27, 1996, P.L. 403, *as amended*, added by the Act of April 18, 2013, P.L. 4, 71 P.S. §§ 1709.1500 - 1709.1521,] on or before July 1 of the year prior to the tax year on appeal before the board . . . .

53 Pa.C.S. § 8802. We have explained:

The CLR is calculated for each county on an annual basis by the STEB using data from all arms-length sales transactions during the relevant period, supplemented by independent appraisal data and other relevant information. . . . For example, "a county's CLR will be 70 if the total assessed value of properties sold in arms-length sales in a year is 70% of the total market value of the properties" in the county.

*GM Berkshire Hills LLC v. Berks Cnty. Bd. of Assessment*, 257 A.3d 822, 825 n.4 (Pa. Cmwlth. 2021), *aff'd by evenly divided court*, 290 A.3d 238 (Pa. 2023). Taxpayers use the CLR "to demonstrate that [their] property has been over-assessed, as it allows [them] to compare the assessed-to-market value ratio of [their] property to the average ratio throughout the district." *In re Sullivan*, 37 A.3d 1250, 1255-56 (Pa. Cmwlth. 2012) (citation and quotation marks omitted).

[6] Common pleas' decision and order can be found at page 389a of the Reproduced Record.

intentionally allowed this systematic undervaluation to continue, it would be the rights of all other taxpayers that would have been violated." (*Id.* at 7.)

Common pleas cited *Valley Forge Towers* and *GM Berkshire Hills LLC v. Berks County Board of Assessment*, 257 A.3d 822 (Pa. Cmwlth. 2021) (*GM Berkshire Hills I*), *aff'd by equally divided court*, 290 A.3d 238 (Pa. 2023) (*GM Berkshire Hills II*). It relied on those cases for the proposition that monetary thresholds are permissible, so long as on their face, they do not discriminate based on property type. Turning to Taxpayer's evidence that the intent and effect of the Policy was discriminatory against commercial properties, common pleas first noted that no evidence suggested that a residential property had been identified but nonetheless not selected over a commercial property. Second, common pleas found that "there was no credible evidence that the reason or purpose behind the Policy was discriminatory. To the contrary, the evidence at trial was that CASD, through Linderman, was looking for avenues to assist CASD with increasing much[-]needed revenue." (Common pleas' decision and order at 10.) Further, common pleas explained, with respect to the monetary threshold itself, there was no evidence that it selected the threshold to eliminate certain property types, but rather to "achieve its revenue goal" with a "cost[-]effective and practical" solution. (*Id.*) "Stating the obvious, if costs outpaced potential benefits, CASD's goal would not be met. There was a legitimate, non-discriminatory distinction for the properties that fell above and below the [monetary] threshold." (*Id.*) Finally, common pleas rejected any suggestions that "political motivations led to prohibited disparate treatment of classes of property." (*Id.*) Taxpayer timely appealed to this Court.

On appeal, Taxpayer advances three main arguments, which we have reordered for ease of disposition: (i) that the monetary threshold aspect of the Policy

12

violates the Uniformity Clause; (ii) that the Policy's criteria "[i]ntentionally or [s]pecifically [o]perate to [t]arget [o]nly [c]ommercial [p]roperties for [a]ppeal" in violation of the Uniformity Clause; and (iii) that CASD applied the Policy in a non-uniform way, such that it selected properties for appeal in an arbitrary and capricious manner in violation of the Uniformity Clause. (Taxpayer's Brief (Br.) at i-ii.)

## II. PARTIES' ARGUMENTS

### A. *Taxpayer's Brief*

Taxpayer argues that monetary thresholds are per se invalid under the Uniformity Clause, noting that our "Supreme Court has held that 'classification based solely on the quantity or value of the property being taxed' is 'arbitrary and unreasonable, and hence, forbidden' under the Uniformity Clause." (Taxpayer's Br. at 50 (quoting *Nextel Commc'ns of Mid-Atl., Inc. v. Dep't of Revenue*, 171 A.3d 682, 696 (Pa. 2017)).) Taxpayer asserts that our decisions in *GM Berkshire Hills I* and *Kennett Consolidated School District v. Chester County Board of Assessment Appeals*, 228 A.3d 29 (Pa. Cmwlth. 2020) (*Kennett Consolidated*), were incorrect because they misconstrued *Valley Forge Towers*. Taxpayer notes that our evenly divided Supreme Court, affirming our decision in *GM Berkshire Hills I*, did not reach consensus on whether monetary thresholds pass constitutional muster. Relatedly, Taxpayer urges us to reject the proposition that there was a cost-benefit analysis at play in this case because CASD never actually performed such an analysis; "[s]imply targeting for appeal only high-valued properties guaranteed to yield a large amount of additional tax is not a 'cost-benefit analysis.'" (Taxpayer's Br. at 41.) Even if such a cost-benefit analysis was permissible under the Uniformity Clause, Taxpayer suggests that it does not justify discriminatory treatment.

13

Taxpayer next argues that "CASD's appeal program violated the Uniformity Clause because its appeal selection criteria intentionally or systematically operate to target only commercial properties for appeal." (*Id.* at 27.) Taxpayer relies on the opinion in support of reversal (OISR) in *GM Berkshire Hills II* for the proposition that "appeal selection criteria cannot be a pretext for targeting or excluding certain classes of properties from appeal." (*Id.*) It points to the fact that CASD did not appeal any residential properties as evidence that the Policy excludes residential. Further, it points to Dr. Angelides' testimony, which "show[s] that commercial properties were much more likely to meet the threshold." (*Id.* at 29.) According to Taxpayer, common pleas "logically should have made explicit findings of fact about this relevant, credible, and unrebutted testimony" but "instead simply ignored it, entirely failing to mention Dr. Angelides or his testimony anywhere in its [d]ecision or Opinion." (*Id.* at 30-31.)

Taxpayer also argues that Linderman's and Lukens' testimony confirms that CASD intended to focus on commercial, and not residential, properties. Further, Taxpayer argues that "Lukens' review of residential properties was limited and perfunctory, at best, showing that he did not expect any residential properties to reach the threshold." (*Id.* at 34.) In addition, Taxpayer argues that CASD school board members publicly expressed their belief that CASD's Policy would not result in appeals from residential assessments. Common pleas' "conclusions about the knowledge or intent of CASD regarding the effect of its selection criteria are unsupported, given that it overlooked the fact that at least one [school] [b]oard member, on two separate occasions, expressed concerns about the impact of district-initiated appeals on residential taxpayers." (*Id.* at 37.) Taxpayer is of the view that the school board knew that the Policy would result in no residential appeals, which

14

it argues belies common pleas' "suggestion that CASD must have acted in a neutral manner because it could not guarantee discriminatory results is entirely unsupported by the record." (*Id.* at 38.) Taxpayer also asserts that common pleas erred in believing Taxpayer had to show discriminatory intent or purpose, but rather it must show either discriminatory intent "**or** that the application of the tax has a discriminatory effect[.]" (*Id.* at 39 (quoting *Millcreek Twp. Sch. Dist. v. Erie Cnty. Bd. of Assessment Appeals*, 737 A.2d 335, 339 (Pa. Cmwlth. 1999)) (Taxpayer's emphasis omitted, emphasis added).)

Taxpayer's final argument is that CASD's method of culling the list from 141 properties that met the threshold down to the 16 it ultimately chose was arbitrary. First, Taxpayer reiterates that limiting the number of appeals absent sufficient cost-benefit justification was arbitrary. Second, CASD, in Taxpayer's view, provided no guidance on how to whittle the list down to that smaller number, and it points to the fact that 6 properties not on the 141-property list made it onto the final list because CASD specifically targeted net-lease properties (drug stores and convenience stores) as "low-hanging fruit." (Taxpayer's Br. at 48.)

### B. CASD's Brief

CASD first argues the use of a cost-benefit analysis by a school district in choosing which property tax assessments to appeal does not violate the Uniformity Clause. It emphasizes that CASD made a business decision to appeal only those property tax assessments that would generate sufficient revenue to justify them, and the Policy allowed it to "judiciously appeal the tax assessments of some of the most under[]assessed properties in [CASD], without regard to the type of property in question[.]" (CASD's Br. at 5.)

15

CASD also highlights the Supreme Court's statement in *Valley Forge Towers* that "nothing in this opinion should be construed as suggesting that the use of a monetary threshold . . . or some other selection criteria would violate uniformity if it were implemented without regard to the type of property in question or the residency status of its owner." *Valley Forge Towers*, 163 A.3d at 979 (footnote omitted). CASD also brings to our attention two unreported decisions of this Court: *East Stroudsburg Area School District v. Meadow Lake Plaza, LLC* (Pa. Cmwlth., No. 371 C.D. 2018, filed October 17, 2019), *appeal denied*, 231 A.3d 772 (Pa. 2020), and *East Stroudsburg Area School District v. Dallan Acquisitions, LLC* (Pa. Cmwlth., No. 529 C.D. 2018, filed October 17, 2019).[7] It argues that under *GM Berkshire Hills I*, which remains good law after our Supreme Court's evenly-divided affirmance, monetary thresholds are permissible.

CASD emphasizes that here, the stipulation reveals that the Property is "grossly under[]assessed." (CASD's Br. at 16.) It encourages the Court to consider "[p]resent[-]day economic realities" which "not only explain and justify" CASD's use of the Policy, "they actually necessitate the use of a cost[-]benefit analysis by a taxing district when deciding whether to file an assessment appeal." (*Id.* at 17.) It summarized:

> [F]rom a cost-benefit standpoint and in consideration of the real[-]world litigation risks associated with differing expert opinions and the potential for the added cost of potential appellate proceedings, [CASD] acted financially responsibly by electing to exercise its statutory right to appeal only those properties that made economic sense, and **not** other properties that may have been under[]assessed by comparatively marginal amounts. It would be a violation of the public trust and breach

---

[7] While not binding, unreported opinions of this Court may be cited for their persuasive authority pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P 126(b), and Section 414(a) of our Internal Operating Procedures, 210 Pa. Code § 69.414(a).

of [CASD]'s fiduciary duty to not consider and follow some reasonable guidelines to protect public funds.

(*Id.* at 17-18 (emphasis in original, footnote omitted).)

CASD asserts that this Court would be reweighing the evidence in violation of our standard of review if we were to accept Taxpayer's argument that the Policy was merely a pretext to discriminate against commercial properties. It explains that common pleas found that there "was no credible evidence that the reason or purpose behind the Policy was discriminatory." (*Id.* at 19 (quoting common pleas' op. at 10).) CASD also submits that common pleas specifically credited Linderman's testimony regarding the "reasons and basis for his suggested policy." (*Id.* at 19-20.) CASD also argues that we should reject Taxpayer's approach, as under it, no economic threshold would be constitutional, contrary to our holdings in *Meadow Lake Plaza*, *Dallan Acquisitions*, and *Punxsutawney Area School District v. Broadwing Timber, LLC* (Pa. Cmwlth., No. 1209 C.D. 2018, filed October 29, 2019).

Finally, CASD suggests that Taxpayer's appeal is really about Taxpayer evading the payment of its fair share of tax. CASD explains that part of the "integrity" and "fairness" of the tax system is diminished "[w]hen a property owner evades or is excused by virtue of underassessment from paying its proportionate share of the burden for supporting governmental services[.]" (*Id.* at 23.) CASD emphasizes that Taxpayer has no right to pay less than its fair share, and that the Property was grossly underassessed.

### C. Taxpayer's Reply Brief

In its reply brief, Taxpayer reiterates that there is no factual basis for the proposition that the monetary threshold in this case was the product of any cost-benefit analysis. Next, it argues that CASD failed to respond to its argument that

common pleas erred in requiring some motive or purpose of discrimination on the part of CASD for a Uniformity Clause violation to result. Taxpayer also argues that while it is true that this Court is bound by credibility determinations and factual findings (to the extent they are supported by competent, substantial evidence), we are not bound by the inferences and deductions derived by common pleas from those facts. In Taxpayer's view, CASD failed to also respond to its claim that CASD's selection of properties from among eligible properties was arbitrary. Finally, Taxpayer rejects the argument that Taxpayer is somehow getting away with not paying its fair share where it concedes the underassessment of the Property because Taxpayer is "hardly paying [its] 'fair share' when other taxpayers have been left alone to continue paying taxes on their underassessed properties." (Taxpayer's Reply Br. at 8-9.)

## III. DISCUSSION[8]

### A. Monetary Thresholds and Cost-Benefit Analysis

Our logical starting place is determining whether, as Taxpayer suggests, monetary thresholds are per se invalid under the Uniformity Clause. Because it is related, we also address whether common pleas erred in finding that the monetary

---

[8] Where a common pleas court takes additional evidence in its *de novo* review of a tax assessment appeal case, this Court's review is limited to whether the common pleas court abused its discretion, committed an error of law, or made findings unsupported by substantial evidence. *Sher v. Berks Cnty. Bd. of Assessment Appeals*, 940 A.2d 629, 632 n.4 (Pa. Cmwlth. 2008). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Norwegian Township v. Schuylkill Cnty. Bd. of Assessment Appeals*, 74 A.3d 1124, 1128 n.3 (Pa. Cmwlth. 2013). The common pleas court, sitting as factfinder, "maintains exclusive province over matters involving the credibility of witnesses and the weight afforded to the evidence. [] As a result, this Court is prohibited from making contrary credibility determinations or reweighing the evidence . . . ." *In re Penn-Delco Sch. Dist.*, 903 A.2d 600, 608 (Pa. Cmwlth. 2006).

18

threshold at issue in this case was the product of a bona fide cost-benefit analysis. But first, we survey the legal landscape surrounding this case more generally.

### 1. Applicable Law

Pennsylvania school districts rely heavily on property tax revenue to carry out their missions. *See William Penn Sch. Dist. v. Pa. Dep't of Educ.*, 294 A.3d 537, 909 (Pa. Cmwlth. 2023) (Cohn Jubelirer, P.J.) (single-judge op.)[9] ("[T]he fact remains that public schools are heavily reliant on local funding. While approximately one-third of school funding revenue comes from the state, more than half generally comes from local sources, primarily in the form of local property taxes."). Clearly, then, school districts have an interest in ensuring that properties are assessed accurately because, to state the obvious, the higher the assessment, the greater the revenue to the school district. Recognizing that interest, the General Assembly has provided a mechanism for school districts to appeal assessments. Section 8855 of the Consolidated County Assessment Law (Law) provides that

> [a] taxing district[10] shall have the right to appeal any assessment within its jurisdiction in the same manner, subject to the same procedure and with like effect as if the appeal were taken by a taxable person with respect to the assessment, and, in addition, may take an appeal from any decision of the board [of assessment appeals] or court of common pleas as though it had been a party to the proceedings before the board or court even though it was not a party in fact. . . .

---

[9] This Court's Internal Operating Procedures provide that "[e]xcept as provided in subsection (d) (relating to single-Judge opinion in election law matters), a single-Judge opinion of this Court, even if reported, shall be cited only for its persuasive value and not as a binding precedent." 210 Pa. Code § 69.414(b).

[10] Section 8855 refers to taxing districts, which the Law defines to include "[a] county, city, borough, incorporated town, township, school district or county institution district." 53 Pa.C.S. § 8802.

19

53 Pa.C.S. § 8855. While the Law does not prescribe a precise methodology for a school district to employ in appealing assessments, our Supreme Court has made clear that school districts must exercise the discretion afforded by Section 8855 within "constitutional boundaries." *Valley Forge Towers*, 163 A.3d at 980.

The relevant constitutional boundary in this case is, of course, the Uniformity Clause, the operative language of which has remained unchanged since becoming part of our Constitution in 1874,[11] and which provides that "[a]ll taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." PA. CONST. art. VIII, § 1. As our Supreme Court has explained,

> [t]he Uniformity Clause is a product of the Gilded Age, drafted in the late nineteenth century, an era of "robber barons" and rapid economic growth. This Court long has recognized that the Constitution of 1874 sought "to correct the evil of unwise, improvident and corrupt legislation which had become rampant at the time of its passage." *Consumer Party of* [*Pa*]. *v. Commonwealth*, . . . 507 A.2d 323, 333 ([Pa.] 1986), *abrogated on other grounds by Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonweal*th, . . . 877 A.2d 383 ([Pa.] 2005); *see Perkins v. City of Phila*[*delphia*], . . . 27 A. 356, 360 ([Pa.] 1893) ("It is certainly not forgotten that the well-nigh unanimous demand which brought the convention of 1873 into existence was prompted by the evils springing from local and special legislation."). With regard to taxation, "[t]he burden of maintaining the state had been, in repeated instances, lifted from the shoulders of favored classes, and thrown upon the remainder of the community." *Fox's Appeal*, . . . 4 A. 149, 153 ([Pa.] 1886). The Uniformity Clause sought to eradicate inequitable fiscal policies that had resulted from parliamentary favoritism and class legislation. *Id.* One commentator offered the following account of the circumstances that precipitated the 1873 constitutional convention:

---

[11] "[T]he general text of the [U]niformity [C]lause has remained unchanged since enactment." Kristin E. Hickman (Note), *The More Things Change, The More They Stay the Same: Interpreting the Pennsylvania Uniformity Clause*, 62 ALB. L. REV. 1695, 1699 (1999) (examining the role of federal equal protection jurisprudence in the interpretation of the Uniformity Clause).

20

> The Pennsylvania Constitution of 1874 . . . was drafted in an atmosphere of extreme distrust of the legislative body and of fear of the growing power of corporations, especially the great railroad corporations. It was the product of a convention whose prevailing mood was one of reform . . . and, overshadowing all else, reform of legislation to eliminate the evil practices that had crept into the legislative process. Legislative reform was truly the dominant motif of the convention and that purpose is woven into the very fabric of the constitution.

ROSALIND L. BRANNING, PENNSYLVANIA CONSTITUTIONAL DEVELOPMENT 37 (1960).

*Mount Airy #1, LLC v. Pa. Dep't of Revenue*, 154 A.3d 268, 273 (Pa. 2016).

In the real estate tax context, it is well established that "real estate as a subject for taxation may **not** be validly divided into different classes." *In re Lower Merion Township*, 233 A.2d 273, 276 (Pa. 1967) (emphasis added). Recently, our Supreme Court has reaffirmed that principle, emphasizing that "real property **is** the classification[,]" and, therefore, taxing authorities may not further subclassify real property into subcategories and treat those categories differently. *Clifton v. Allegheny County*, 969 A.2d 1197, 1212 (Pa. 2009) (emphasis in original).[12]

---

[12] Interestingly, contemporaneously with its adoption, our Supreme Court did permit reasonable classification and disparate taxation of property based on property type. As the Court explained,

> [i]t is quite true . . . that this Court's initial interpretation of the [U]niformity [C]lause permitted division of real estate into different classes. In both *Kitty Roup's Case*, 81 1/2 Pa. 211 (1874)[,] and *City of Williamsport v. Brown*, 84 Pa. 438 (1877)[,] ordinances taxing rural and urban property at different rates were sustained. . . . But in 1909 these . . . cases were all implicitly overruled by Mr. Justice Elkin, writing for the Court in *Delaware, Lackawanna & Western Rail[way] Co[mpany's] Tax Assessment (No. 1)*, [] 73 A. 429 ([Pa.] 1909).

*Lower Merion Township*, 233 A.2d at 276.

Those general principles in mind, we turn to the leading case on the matter. *Valley Forge Towers* involved a school district's tax assessment appeal program "concentrated **solely** on commercial properties, including apartment complexes." 163 A.3d at 966 (emphasis added). The appellants, apartment complex owners in the district, sued, arguing that the selective appeal of their properties violated the Uniformity Clause. Sustaining the taxpayers' challenge, the Supreme Court reiterated the "longstanding principle that 'a taxpayer is entitled to relief under the Uniformity Clause where his property is assessed at a higher percentage of fair market value than other properties throughout the taxing district.'" *Id.* at 972 (quoting *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 913 A.2d 194, 199 (Pa. 2006) (*Lionville Assocs.*)). That principle derives from the notion "that taxpayers should pay no more or less than their proportionate share of government." *Id.* (quoting *Lionville Assocs.*, 913 A.2d at 200). Particularly relevant here, the Court made two points clear.

> First, all property in a taxing district is a single class, and, as a consequence, the Uniformity Clause does not permit the government, including taxing authorities, to treat different property sub-classifications in a disparate manner. . . . Second, this prohibition applies to any intentional or systematic enforcement of the tax laws, and is not limited solely to wrongful conduct. . . .

*Id.* at 975 (citations omitted).

The Court rejected the argument that the only recourse available to school districts was to appeal **all** property tax assessments, and the related proposition that an appellant must demand a countywide reassessment or nothing at all. Indeed, the Court left open the possibility of "other, nondiscriminatory, methods of deciding which properties to appeal." *Id.* at 977.

22

The implications of the constitutional backdrop, the Court observed, were that "a taxing authority is not permitted to implement a program of only appealing the assessments of one sub-classification of properties, where that sub-classification is drawn according to property type—that is, its use as a commercial apartment complex, single-family residential, industrial, or the like." *Id.* at 978. But the Court

> clarif[ied] that nothing in [its] opinion should be construed as suggesting that the use of a monetary threshold—such as the one challenged in [*In re*] *Springfield* [*School District*, 101 A.3d 835 (Pa. Cmwlth. 2014)[13]]—or some other selection criteria would violate uniformity if it were implemented without regard to the type of property in question or the residency status of its owner.

*Id.* at 979 (footnote omitted). According to the *Valley Forge Towers* Court, the goal of maximizing revenue must give way to nondiscriminatory implementation of the taxing system; it observed that "the two objectives do not necessarily conflict." *Id.* at 980.

Post-*Valley Forge Towers*, this Court has considered the issue of monetary thresholds several times. In *Kennett Consolidated*, we emphasized that the Supreme Court had left open the question whether monetary thresholds violated the Uniformity Clause. There, we were satisfied that our holding in the unreported *Meadow Lake Plaza* was correct, summarizing and incorporating it as follows:

> We concluded [in *Meadow Lake Plaza*] that "nothing in our Supreme Court's analysis in *Valley Forge* [*Towers*] precludes application of a reasonable monetary threshold for assessment appeals, based on an estimate of the minimum potential revenue gain that will make a tax assessment appeal cost [] effective." [*Meadow Lake Plaza*, slip op.] at 11. We also rejected the taxpayer's argument that, even though the

---

[13] The *Springfield* Court explained that "[t]he [s]chool [d]istrict's $500,000 threshold was based on the reasonable financial and economic considerations of increasing its revenue and the costs of filing assessment appeals. The $500,000 difference between the sale price and the implied market value represented $9[,]000 to $11,000 in additional tax revenue, which justified the costs of appeals." *Springfield*, 101 A.3d at 849.

23

policy was facially neutral, it ran afoul of the Uniformity Clause because only commercial properties had their assessments appealed. *Id.* This Court pointed out that the court of common pleas credited the testimony that the school district searched "for any and all properties" meeting the $10,000[] threshold, and would have filed an assessment appeal of a residential property so long as it came within the threshold. *Id.* at 12. Moreover, we concluded that the "$10,000 threshold [was] reasonable and [did] not violate the uniformity requirement of the Pennsylvania Constitution, despite the fact that in this particular instance, only commercial properties in the [s]chool [d]istrict met that threshold." *Id.* at 13.

Thus, our decision in [*Meadow Lake Plaza*] authorized the use of such thresholds. Our holding in [*Meadow Lake Plaza*] plainly determined that, even though a monetary threshold resulted in only commercial properties having their assessments appealed, such practice did not violate the Uniformity Clause.

*Kennett Consol.*, 228 A.3d at 41 (some brackets omitted). We concluded, quite simply, that "monetary thresholds do not violate the Uniformity Clause." *Id.* We emphasized that in that case, the school district "was using a monetary threshold only for the purpose of making prudent fiscal decisions, and not for the purpose of discriminating against sub-classes of properties. Because [the d]istrict deliberately ignored the property type and focused only on its fiscal considerations, [it] did not violate the Uniformity Clause." *Id.* While the Supreme Court initially granted allocatur in *Kennett Consolidated*, 240 A.3d 611 (Pa. 2020), after argument, it dismissed the appeal as improvidently granted, 259 A.3d 890 (Pa. 2021). Accordingly, *Kennett Consolidated* remains precedential.

A year after *Kennett Consolidated*, we decided *GM Berkshire Hills I*, in which we reaffirmed the constitutionality of monetary thresholds. There, the owner of two apartment buildings—which it had purchased for approximately $54 million, and which had an assessed value of approximately $10 million—appealed from the court of common pleas' decision which granted the school district's assessment appeal.

24

The policy in *GM Berkshire Hills I* required the school district to pursue appeals where the difference between the assessed value and the current value (as documented by a recent sale and multiplied by the CLR) was more than $150,000. That monetary threshold was based on "a cost-benefit [analysis] at which the revenue from a successful appeal would justify the cost of the legal and appraisal fees necessary for the [d]istrict to undertake the appeal." *GM Berkshire Hills I*, 257 A.3d at 825. The policy was facially sub-classification neutral, and in effect, it led to appeals of industrial, farm, commercial, residential, and apartment complexes. The property at issue there, the district determined, was underassessed by more than $26 million, such that it satisfied the $150,000 threshold.

We concluded that "[b]ecause the [d]istrict's method is purely quantitative . . . beginning with type-neutral listings for recent sales transactions in [] monthly [] reports, we find it does not present the type of constitutional infirmities present in *Valley Forge Towers*." *Id.* at 834. We recognized that our Supreme Court had put its imprimatur on the idea that

> perfection in property assessment may not be possible and that uniformity considerations will not be offended by an otherwise acceptable "salutary methodology to better assure that each taxpayer would pay no more nor less than his fair share, to the extent that such fair share [is] reasonably susceptible of ascertainment."

*Id.* (quoting *Lionville Assocs.*, 913 A.2d at 205). We described our approach as "realistic" and "dovetail[ing] with the Court's recognition that while constitutional principles are primary, the practical fiscal concerns of a school district **still matter and may not be ignored**." *Id.* at 834-35 (citation omitted) (emphasis added). And of course, one of the practical concerns for school districts is "the cost effectiveness of each assessment appeal it decides to undertake." *Id.* at 835. An equally divided Supreme Court affirmed in *GM Berkshire Hills II*, and thus, like *Kennett*

*Consolidated*, our opinion in *GM Berkshire Hills I* remains good law and binding precedent of this Court.

2. Analysis

As discussed above, and consistent with our Supreme Court's reasoning in *Valley Forge Towers*, and holdings in *Kennett Consolidated* and *GM Berkshire Hills I* teach that facially property-type-neutral monetary thresholds do not per se run afoul of the Uniformity Clause. Indeed, we have definitively read "*Valley Forge Towers* . . . [as] [impl[ying] that so long as a school district's selection methods did not discriminate on the basis of property type, **use of a monetary formula would not amount to a per se constitutional violation**." *GM Berkshire Hills I*, 257 A.3d at 833 (emphasis added).

We continue to believe our reasoning in *Kennett Consolidated*, *GM Berkshire Hills I*, and *Broadwing Timber* is correct, and, therefore, we reaffirm the logic of those cases. First, as a general matter, monetary thresholds represent school districts' reliance on the commonsense notion that "the two objectives" of generating revenue on one hand, and ensuring implementation of a taxing system that operates in a nondiscriminatory manner on the other, "do not necessarily conflict." *Valley Forge Towers*, 163 A.3d at 980. Indeed, when a school district adopts such a monetary threshold, it sends the message that no specific property type is the target, but rather underassessed properties of all types because the school district simply wants to increase revenue by applying a facially fair and neutral policy.

Further, we continue to recognize that "a reasonable monetary threshold for assessment appeals, based on an estimate of the minimum potential revenue gain that will make a tax assessment appeal cost [] effective" is not precluded by *Valley*

26

*Forge Towers*, and that "a taxing district's selection of a property for an assessment appeal that failed to take into account whether the appeal was likely to be cost-effective **might well be fiscally irresponsible**." *GM Berkshire Hills I*, 257 A.3d at 834 (emphasis added). This flows from the understanding that it would be impossible—and not cost effective—for a school district to appeal each underassessed property, and thus a waste of taxpayer funds for it to spend time and resources on appeals that would **lose** the school district money.

At bottom, the General Assembly has given school districts the power to appeal assessments. 53 Pa.C.S. § 8855. *Valley Forge Towers* explained that school districts have tools to appeal property tax assessments **short of** countywide reassessments. *See Valley Forge Towers*, 163 A.3d at 977 ("There are other, nondiscriminatory, methods of deciding which properties to appeal."). For that to mean something, school districts must have a means of designing facially neutral, quantitatively grounded policies to create predictability and fairness in a taxing district. Indeed, it seems doubtful that Section 8855 of the Law would be anything more than a nullity if we were to conclude that no monetary threshold could pass constitutional muster. What is more, in allowing school districts to appeal property assessments, the General Assembly necessarily recognized that school boards are politically accountable. Accordingly, taxpayers in disagreement with a school board's approach to assessment appeals can use the political process to advocate for different methodologies.

Here, Taxpayer relies on the OISR from *GM Berkshire Hills II* for the proposition that we have misconstrued *Valley Forge Towers* in our cases approving of monetary thresholds. We recognize that when our Supreme Court divides equally in a case, neither opinion having commanded a majority of the Court, **neither**

**opinion becomes precedential**. *See Commonwealth v. James*, 427 A.2d 148, 149 (Pa. 1981) ("no precedent [is] established in an affirmance by an equally divided court"); *Lower Bucks Cnty. Joint Mun. Auth. v. Koszarek*, 244 A.3d 54, 65 n.15 (Pa. Cmwlth. 2020) (same). To the extent this Court may have cast doubt on the constitutionality of monetary thresholds by quoting the OISR in *GM Berkshire Hills II*, **such reliance was inconsistent** because our Court's precedents, as of now undisrupted by the Supreme Court, **approve** of monetary thresholds. *See Sch. Dist. of Phila. v. Bd. of Revision of Taxes*, 303 A.3d 1150, 1164 (Pa. Cmwlth. 2023) (noting that the potential approval of monetary thresholds was not the holding but "unfortunate dicta") (quoting *GM Berkshire Hills II*, 290 A.3d at 253 (OISR)); *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 303 A.3d 1104, 1113 (Pa. Cmwlth. 2023) (*Marchwood*) (citing the OISR for the proposition that "the potential propriety of a monetary threshold was dicta"), *pet. for allowance of appeal granted sub nom. Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals Tax Parcel No.: 33-5-43.3*, __ A.3d __ (Pa., Nos. 678, 679 MAL 2023, order filed June 12, 2024) (per curiam), 2024 WL 2951367.[14] In short,

---

[14] The Supreme Court granted allocatur as to the following questions:

(1) Whether the Commonwealth Court Majority incorrectly held that the [s]chool [d]istrict must appeal all potentially underassessed properties in the [s]chool [d]istrict in order to comply with the Uniformity Clause . . . [,] which holding is inconsistent with Pennsylvania Supreme Court precedent explicitly recognizing that there will never be perfect uniformity in real estate taxation, and constitutes a wholly impractical requirement?

(2) Whether the Commonwealth Court Majority incorrectly held that the [s]chool [d]istrict implemented its tax assessment appeal policy in an arbitrary fashion— where the factual basis for such holding was not established at trial, is explicitly contradicted by the record, and improperly disregards the totality of the trial

**(Footnote continued on next page…)**

because *GM Berkshire Hills I* remains good law, and because Taxpayer has not persuaded us that it was erroneous, such that we should overrule it, the OISR in *GM Berkshire Hills II* does not compel a different result.[15]

_____

evidence and testimony—and is inconsistent with the standards set forth by the Pennsylvania Supreme Court, as well as Commonwealth Court precedent?

*Downingtown Area Sch. Dist.*, __ A.3d at __, 2024 WL 2951367, at \*1. On June 19, 2024, CASD filed an Application for Relief Seeking Leave to File Post-Argument Communication in the Nature of a Post-Submission Communication (Application), to which Taxpayer filed an answer, asking the Court to deny the Application. Because the Court takes judicial notice of the fact that the Supreme Court granted allocatur, and recognizing that the grant of allocatur does not affect the precedential nature of our decision, the Application is denied. *Marks v. Nationwide Ins. Co.*, 762 A.2d 1098, 1101 (Pa. Super. 2000) (an intermediate appellate decision remains precedential, despite an intervening grant of a petition for allowance of appeal as to that decision, unless or until the Supreme Court overturns it).

[15] The dissent argues we should overrule *GM Berkshire Hills I* and similar cases like *Kennett Consolidated. Coatesville Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, ___ A.3d ___, ___ (Pa. Cmwlth., No. 1313 C.D. 2022, filed August 15, 2024), slip op. at 1-2 (Dumas, J., dissenting). We disagree.

First, under basic stare decisis principles, this Court now sitting en banc should not overrule *GM Berkshire Hills I*. The command of stare decisis is simple: we are bound to follow our own precedent unless the Supreme Court overrules it, or unless a litigant gives us a "compelling reason" to warrant departure from it. *See City of Philadelphia v. Tax Rev. Bd. of City of Phila.*, 713 A.2d 718, 720 (Pa. Cmwlth. 1998); *Armstrong County v. Workmen's Comp. Appeal Bd. (Ross & Borough of Kittanning)*, 473 A.2d 755, 757 (Pa. Cmwlth. 1984). Courts do not typically overrule their precedent sua sponte. Here, Taxpayer does not explicitly call on this Court to overrule our monetary threshold precedent, nor has it briefed (or given CASD the opportunity to respond to) any argument why there exists a "compelling reason" to overrule those cases. *City of Philadelphia*, 713 A.2d at 720. Nor has Taxpayer briefed the factors courts typically consider in deciding whether precedent should be tossed. *See Allegheny Reproductive Health Ctr. v. Pa. Dep't of Hum. Servs.*, 309 A.3d 808, 882-83 (Pa. 2023) (listing factors courts may consider, including "quality of the precedent's reasoning, consistency and coherence with other decisions, changed law, changed facts, and workability, among other factors") (quoting *Ramos v. Louisiana*, 590 U.S. 83, 121 (2020) (Kavanaugh, J., concurring)); *see also Ins. Fed'n of Pa., Inc. v. Koken*, 801 A.2d 622, 632 (Pa. Cmwlth. 2002) (Pellegrini, J., concurring) (analyzing reliance, workability, changes in law, or changes in fact as relevant considerations in the stare decisis analysis), *rev'd*, 889 A.2d 550 (Pa. 2005). We should not overrule our precedent unless a litigant explicitly asks us to do so, accompanied by thorough briefing addressing at least the compelling reason upon which that litigant relies, which very well may include consideration of other relevant factors.
**(Footnote continued on next page…)**

29

However, along with its monetary threshold argument, Taxpayer relatedly argues that even if monetary thresholds are permissible, this threshold is invalid because it was not the result of any real cost-benefit analysis on the part of CASD. However, the record belies that assertion. It is true that Linderman did not rely on a precise formula in determining the exact break-even point for the school district or the exact number of district-initiated appeals his team could handle, but he did rely on his experience and on information from neighboring districts to estimate what would be workable for CASD. (R.R. at 43a-44a.) Our cases do not require exact science or an actuarial analysis; rather they require a "reasonable monetary threshold . . . based on an **estimate** of the minimum potential revenue gain that will make a tax assessment appeal cost-effective." *GM Berkshire Hills I*, 257 A.3d at 834 (quoting *Meadow Lake Plaza*, slip op. at 5) (emphasis added). That comports with the bedrock principle of our Commonwealth's Uniformity Clause jurisprudence that

---

Even if Taxpayer had argued in a full-throated and thorough manner that *GM Berkshire Hills I* ought to be overruled, we discern no compelling reason to do so. While there are certainly respectable arguments on the merits from the three Justices who endorsed the OISR in *GM Berkshire Hills II*, there were still three Justices who would have affirmed *GM Berkshire Hills I*. It is hard to say that our Supreme Court equally dividing on a difficult legal question means that we were so grievously wrong such that overruling is warranted.

Further, a grant of allocatur does not effect a change in the law; it signals that a change in the law is possible. *Marks*, 762 A.2d at 1101. While an argument might exist that we should hold this case pending the Supreme Court's disposition of a case presenting similar issues, Taxpayer has not made that argument. Taxpayer brought its Application under Pa.R.A.P. 2501(a), explicitly acknowledging that its letter to the Court regarding the *Downingtown Area School District* allocatur grant "does not contain any argument." (Appl. ¶ 9.) This Court decides the cases that come before it under the law as it exists at the time of its disposition.

In sum, as our extensive analysis in this opinion reveals, we disagree with the dissent on the merits that *GM Berkshire Hills I* should be overruled. But more to the point, we believe that under the doctrine of stare decisis—given that Taxpayer has not explicitly argued for its overruling, nor has it briefed the compelling reasons and other factors we should consider in overruling precedent—*GM Berkshire Hills I* should not be overruled. It is binding precedent of this Court unless or until our Supreme Court overrules it.

30

"[t]axation . . . is not a matter of exact science; hence absolute equality and perfect uniformity are not required to satisfy the constitutional uniformity requirement." *Clifton*, 969 A.2d at 1210. *See also In re Harleigh Realty Co.*, 149 A. 653, 654 (Pa. 1930) ("Scientific formulae, arithmetical deductions and mental contemplations[] have small value in making assessments under our **practical system of taxation**.") (emphasis added). Common pleas credited Linderman's experience and his belief that 10-15 appeals would be "doable" for CASD. (Common pleas' op. at 2.) Common pleas did not err in finding that a bona fide cost-benefit analysis, based on Linderman's more than three decades of experience, led to the adoption of the $10,000 monetary threshold.

In sum, there is no per se rule that facially neutral, quantitative monetary thresholds violate the Uniformity Clause. And here, the monetary threshold was the product of a reasonable cost-benefit analysis on the part of CASD.

### B. Policy Implementation

Having concluded that there is no per se constitutional problem with monetary thresholds, we next address whether CASD's Policy unconstitutionally targeted only commercial properties.

To support its argument that the Policy's effect was intentional and systematic disparate treatment of commercial properties, Taxpayer points to *Lionville Associates*, in which our Supreme Court referred to the "prevailing requirement that similarly situated taxpayers should not be treated differently by taxing authorities." 913 A.2d at 201 (footnote omitted). In a footnote, the Supreme Court clarified that "deliberate" differential treatment does not necessarily mean "wrongful conduct," but rather "includes any intentional or systematic method of enforcement of the tax laws." *Id.* at 201 n.10.

31

In *Broadwing Timber*, we rejected a taxpayer's argument that the fact that a policy had not yet resulted in the appeal of a residential property's assessment evidenced a Uniformity Clause problem. There, we explained:

> [T]hat the [school] [d]istrict's practice **thus far** has resulted in appeals of commercial or commercially-used properties is not determinative where that practice is implemented or carried out without regard to the type or ownership of a property. The [school] [d]istrict relies on the occurrence of a triggering event to bring a potentially underassessed property to its attention. So far, no sale of residential properties has resulted in a high enough realty transfer tax to warrant review, and [the taxpayer] has not presented evidence to the contrary. That is not to say that none will in the future, and, based on [the] [b]usiness [a]dministrator's credited testimony, if one does, the same process will be used to determine whether that property's assessment should be appealed. Such result is consistent with [*Meadow Lake Plaza*], wherein we rejected the taxpayer[']s argument that, even if the threshold was facially neutral, it resulted in the appeal only of commercial properties based on the credited evidence presented by the school district that it would have appealed any residential property's assessment had any met the threshold. Slip op. at 11-12.

*Broadwing Timber*, slip op. at 21-22. In sum, we recognized in *Broadwing Timber* that the mere fact that a given assessment appeal policy has not yet resulted in appeal of a residential property does not mean that the policy is being implemented in an unconstitutional manner. Further, evidence to suggest that the school district **would** appeal an eligible residential property can be probative of the constitutionality of a policy.

Here, common pleas found that "there was no evidence presented that the Policy resulted in the identification of a residential property that met the threshold, but such property was not selected for appeal. There was no evidence that CASD chose to appeal one qualifying commercial property and not a similarly qualifying residential property." (Common pleas' op. at 9.) Further, Lukens testified to the detailed fashion in which he analyzed residential properties to see if any had merit.

32

(R.R. at 112a-13a.)  In sum, the Policy is blind to property type, and substantial evidence of record establishes that, like in *Broadwing Timber*, CASD was open to appealing a residential property tax assessment; it simply had not identified one yet that met the threshold.

Dr. Angelides' testimony does not compel a different result.  Sitting as factfinder in the *de novo* review context, common pleas had the prerogative to believe all, some, or none of the evidence, to make credibility determinations, and to weigh the evidence. *In re Penn-Delco Sch. Dist.*, 903 A.2d 600, 608 (Pa. Cmwlth. 2006).  Further, common pleas was not obliged to accept even unrebutted expert testimony. *Green v. Schuylkill Cnty. Bd. of Assessment Appeals*, 772 A.2d 419, 429-30 (Pa. 2001).  Quite simply, common pleas acted within its discretion in disregarding Dr. Angelides' testimony.

Further, we also reject Taxpayer's argument that common pleas disregarded the political motivations at play.  Common pleas rejected that argument after hearing the videos of the school board meetings at issue and after listening to Linderman's live testimony about "the reasons and basis for his [then-]suggested policy." (Common pleas' op. at 9.)  Further, having determined that, in **operation**, the Policy worked no Uniformity Clause violation, Linderman's comments about how he viewed the Policy would operate are irrelevant.  And even if those comments were relevant, Linderman simply stated that the Policy would mostly affect higher-end residential and commercial properties.  Linderman acknowledged that *Valley Forge Towers* required bona fide consideration of both residential and commercial properties, and he made no assurance that residential properties would be immune from the Policy.

33

In sum, consistent with *Broadwing Timber*, we discern no constitutional violation in the operation and effect of the Policy. CASD looked at residential properties, and it signaled openness to appealing a residential tax assessment. Like *Broadwing Timber*, no residential property met the threshold for the year in question, but that certainly does not mean that one will not in the future.

### C. Arbitrary and Capricious Selection of Properties

#### 1. Applicable Law

In *Valley Forge Towers*, our Supreme Court made clear that the Uniformity Clause requires "that similarly situated taxpayers should not be **deliberately treated differently** by taxing authorities." *Valley Forge Towers*, 163 A.3d at 975 (quoting *Lionville Assocs.*, 913 A.2d at 201) (some emphasis added).

Recently, this Court has decided two cases finding school districts' implementation of monetary thresholds arbitrary. In *School District of Philadelphia*, a school district developed an appeal policy that required a monetary threshold of $7,500 of additional tax revenue. The district contracted with a real estate advisory firm, which, in the three weeks it had to do so, selected the properties for appeal in the following manner. First, the real estate advisor listed 580,000 properties on a spreadsheet, eliminating approximately 520,000 "randomly" and by "eyeball[ing] it." *Sch. Dist. of Phila.*, 303 A.3d at 1159. That left him with approximately 65,000 properties. He used that process to further reduce the number of properties to 266, 138 of which he ultimately recommended for appeal. Despite evidence that some residential properties would have met the $7,500 threshold, the real estate advisor did not allocate time toward those. Further, the taxpayers' expert noted that the real estate advisor appeared to have selected properties only at the beginning and end of

his spreadsheet. Philadelphia's Board of Revision of Taxes upheld the assessment appeals, and the county court quashed those appeals.

We affirmed, describing the district's methodology as "random and piecemeal" and "neither objective nor neutral[,]" "tilt[ing] toward the selection of a sub-classification of properties, *i.e.*, commercial and industrial[.]" *Id.* at 1163-64. Further, though the methodology was facially neutral, its "haphazard implementation" rendered it practically discriminatory against commercial properties and thus violative of the Uniformity Clause. *Id.* at 1164. We concluded that

> the findings of the trial court support[ed] its conclusion that the . . . tax assessment appeals [at issue in that case] violated the Uniformity Clause. [The real estate advisor's] idiosyncratic and subjective selection of underassessed properties was **arbitrary** and **deliberately exempted** from review numerous properties that could have yielded an additional $7,500 in annual tax revenue. At least 33 single-family residential properties met the monetary formula threshold that could have been appealed but were not. . . . This "systematic disparate enforcement of the tax laws" created the violation of the Uniformity Clause. *Valley Forge* [*Towers*], 163 A.3d at 978. It is well established that a "taxpayer is entitled to relief under the Uniformity Clause where his property is assessed at a higher percentage of fair market value than other properties throughout the taxing district." [*Lionville Assocs.*], 913 A.2d at 199. Here, [the t]axpayers showed that the [] [d]istrict's appeal sought to assess their properties at a higher percentage of fair market value than most other properties in the City.

*Id.* at 1164-65.

That same day, this Court in *Marchwood* concluded that implementation of a monetary threshold was arbitrary where the combination of the following four factors was present:

> First, [the school district] chose to appeal the assessments of 16 properties even though it knew that there were many more properties in

35

the [] [d]istrict that satisfied the monetary threshold. Second, Lukens[16] testified that he "did not have a hard and fast rule with respect to the methodology [he] used" to identify properties, and he could not elucidate these flexible "rules" that he used. . . . He could only state that he was "trying to maximize the return to the [s]chool [d]istrict." . . . Third, the [] apartment complex [subject to the appeal] was not on Lukens' list of properties identified for an assessment appeal, and the [s]chool [d]istrict offered no explanation for the later selection of the Marchwood apartment complex for an assessment appeal. Fourth, the [s]chool [d]istrict rejected a commercial property that met the monetary threshold for the sole reason that its counsel was aggressive.

*Marchwood*, 303 A.2d at 1113. The approach of the *Marchwood* and *School District of Philadelphia* Courts reveals that whether a given policy has been implemented arbitrarily **turns on the unique facts of each of case**, such that we must examine the totality of the circumstances in making such a determination.

And while our caselaw does not set forth the precise legal standard of determining whether a taxing authority has acted arbitrarily, we are mindful that arbitrariness typically involves "determination[s] made without consideration of or regard for facts, circumstances, fixed rules, or procedures" or decisions "founded on prejudice rather than on reason or fact." BLACK'S LAW DICTIONARY (11th ed. 2019).

2. Analysis

We agree with CASD and common pleas that CASD did not implement its Policy in an arbitrary way. First, as discussed above, it was not improper for CASD to employ a monetary threshold, and we approve of the propriety of $10,000 threshold in this case as finding support in substantial evidence of record. We discern no requirement that the monetary threshold be calibrated to yield the precise number of properties a given district has the capacity to appeal. Here, the record

---

[16] Lukens also consulted with the school district in the *Marchwood* litigation.

shows that 141 properties potentially satisfied the $10,000 threshold, and that CASD ultimately selected 16 of those properties for appeal. (R.R. at 94a-95a; common pleas' op. at 4.) Zooming out, we note that the monetary threshold eliminated a substantial amount of discretion because it significantly narrowed the pool of eligible properties. Nor does the fact that CASD considered a specific type of commercial property it knew to be chronically underassessed—net-leased properties—render its selection process arbitrary. To the contrary, consideration of the unique factors of the properties holistically to determine which make the most financial sense is not random or piecemeal, but rather reflects consideration of all the facts and circumstances to make a principled decision. Lukens' testimony revealed that he and his team looked at the list and conducted further research to determine, in their opinion and experience, the properties from that list to appeal.[17]

*School District of Philadelphia* does not compel a contrary result. There, the Court explained that the consultant eliminated some 60,000 properties by "eyeball[ing]" the spreadsheet. *Sch. Dist. of Phila.*, 303 A.3d at 1159. Here, by contrast, the consultant whittled down a list of 141 properties to 16 by discussing with colleagues and doing further research. What is more, in *School District of Philadelphia*, there was evidence that some residential properties met the threshold but were nonetheless **not** selected. *Id.* No such evidence exists in this case. Taxpayer did not demonstrate that the conference table session in this case resulted in a "random and piecemeal" selection of properties for appeal. *Id.* at 1163.

---

[17] While common pleas did not specifically address Lukens' testimony, we are cognizant that, in the context of a decision following a non-jury trial, we are to consider the evidence in the light most favorable to the prevailing party. *Pottstown Sch. Dist. v. Montgomery Cnty. Bd. of Assessment Appeals*, 289 A.3d 1142, 1145 n.3 (Pa. Cmwlth. 2023).

*Marchwood* is also distinguishable on its facts. Specifically, the Court there focused on the fact that the subject property in that case **was not on the consultant's list of properties to appeal in the first instance**. *Marchwood*, 303 A.3d at 1113. The Court also noted that a consultant testified that he declined to select an eligible property because of aggressive counsel. *Id.* Those facts are certainly not present here. Further, as discussed above, we must consider each case on its facts. Looking to the record here, we note that Lukens was able to explain his method of examining both residential and commercial properties and that he met with his team at a conference table session to discuss a relatively short list of 141 properties, using his expertise to whittle the list down to 16 properties. We cannot say that such a decision was based on "prejudice" rather than "reason or fact" and thus arbitrary. "Arbitrary," BLACK'S LAW DICTIONARY (11th ed. 2019).[18]

## IV.  CONCLUSION

Our Supreme Court in *Valley Forge Towers* explicitly left open the possibility of constitutionally permissible monetary thresholds, and *GM Berkshire Hills I*—which remains good law—held that monetary thresholds that are blind to property type do not per se violate the Uniformity Clause. Indeed, monetary thresholds are a tool school districts can use to simultaneously respect the need for complying with the Uniformity Clause while also making sound financial decisions with taxpayer resources. Further, we agree with CASD that its implementation of the Policy did

---

[18] We are not persuaded by Taxpayer's argument that Lukens' comment that the sixteenth property on the list was the equivalent of a deli "[g]iv[ing] a customer a pickle" requires a finding of arbitrariness. (R.R. at 78a.) Indeed, Linderman's cutoff of 10-15 properties for appeal was a range based on experience; he never purported to provide a scientific, down-to-the-decimal rule. That Lukens, upon his review, identified 16, rather than 10-15 properties, does not render the implementation of the Policy arbitrary.

not discriminate against commercial properties, and was not arbitrary, in violation of the Uniformity Clause.  Accordingly, we affirm.

_____

**RENÉE COHN JUBELIRER,** President Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Coatesville Area School District    :
    :
        v.    :    No. 1313 C.D. 2022
    :
Chester County Board of Assessment    :
Appeals and Preserve at Milltown    :
Lantern Owner LLC    :
    :
Appeal of:  Preserve at Milltown    :
Lantern Owner LLC    :

## O R D E R

**NOW**, August 15, 2024, the Order of the Court of Common Pleas of Chester County, entered in the above-captioned matter, is **AFFIRMED**.  The Application for Relief Seeking Leave to File Post-Argument Communication in the Nature of a Post-Submission Communication filed by Coatesville Area School District is **DENIED**.

_____
**RENÉE COHN JUBELIRER,** President Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Coatesville Area School District    :
    :
           v.    :   No. 1313 C.D. 2022
    :   Argued:  December 6, 2023
Chester County Board of Assessment    :
Appeals and Preserve at Milltown    :
Lantern Owner LLC    :
    :
Appeal of:  Preserve at Milltown    :
Lantern Owner LLC    :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
           HONORABLE PATRICIA A. McCULLOUGH, Judge
           HONORABLE ANNE E. COVEY, Judge
           HONORABLE MICHAEL H. WOJCIK, Judge
           HONORABLE ELLEN CEISLER, Judge
           HONORABLE LORI A. DUMAS, Judge
           HONORABLE STACY WALLACE, Judge


DISSENTING OPINION
BY JUDGE DUMAS          FILED:  August 15, 2024


        I respectfully dissent for three reasons.  First, in my view, the issue is before our Supreme Court.  *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 303 A.3d 1104 (Pa. Cmwlth. 2023) (*Downingtown II*), *appeal granted* (Pa., Nos. 678, 679 MAL 2023, filed June 12, 2024) (*Downingtown III*) (*per curiam* order).[1]  Second, I am more persuaded by the opinions in support of reversal in *GM Berkshire Hills LLC v. Berks County Board of Assessment*, 290 A.3d 238 (Pa. 2023) (*GM Berkshire Hills II*), which criticize the majority's analytical framework.  Third, our Supreme Court has held unconstitutional similar taxes with

---

[1] This Court has denied Coatesville Area School District's (Coatesville) application to address the *Downingtown* Court's order.  *See* Appl. for Relief Seeking Leave to File Post-Argument Commc'n in the Nature of a Post-Submission Commc'n, 6/19/24.

monetary thresholds under the Uniformity Clause of the Pennsylvania Constitution.[2] Thus, I believe this *en banc* Court should overrule *GM Berkshire Hills, LLC v. Berks County Board of Assessment*, 257 A.3d 822 (Pa. Cmwlth. 2021), *aff'd by an equally divided court*, 290 A.3d 238 (Pa. 2023), *Kennett Consolidated School District v. Chester County Board of Assessment Appeals*, 228 A.3d 29 (Pa. Cmwlth. 2020), and similar cases.

## I.

Initially, the majority states that because "school districts rely heavily on property tax revenue," school districts have the right to appeal property tax assessments. *Coatesville Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, ___ A.3d ___, ___ (Pa. Cmwlth., No. 1313 C.D. 2022, filed August 15, 2024) (*Coatesville*), slip op. at 19 (citing 53 Pa.C.S. § 8855). The issue, however, is whether the government may use a $10,000 monetary threshold as a mechanism to select which property tax assessments to appeal. *Id.* at 18. *Cf. Valley Forge Towers Apartments N, LP v. Upper Merion Area Sch. Dist.*, 163 A.3d 962, 980 (Pa. 2017) (*Valley Forge*) ("Where there is a conflict between maximizing revenue and ensuring that the taxing system is implemented in a non-discriminatory way, the Uniformity Clause requires that the latter goal be given primacy." (citation omitted)).

A similar issue is presently before our Supreme Court: whether a school district's implementation of a $10,000 monetary threshold violates the Uniformity Clause. *Downingtown III*; *Downingtown II*, 303 A.3d at 1114 (criticizing the school district for its "piecemeal implementation of this policy," which resulted in a deliberate decision to not challenge other underassessed properties and a violation

---

[2] Pa. Const. art. VIII, § 1 ("All taxes shall be uniform, upon the same class of subjects, within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.").

of the Uniformity Clause).  I would hold the case pending our Supreme Court's disposition of the appeal.

## II.

### A.

Second, under the Uniformity Clause, a property owner should have no reason to feel he is bearing a "disproportionate share of the tax burden" as compared to his neighbor.  *GM Berkshire Hills II*, 290 A.3d at 251 (Donohue, J., opinion in support of reversal).[3]  As Justice Donohue points out, the key inquiry is *not* whether the monetary threshold is "sound or reasonable, but whether the policy is constitutional."  *Id.* at 251, 254 (emphasizing that "when addressing a Uniformity Clause challenge . . . , we are not concerned with the *intention* of a selection criteria, but with its *impact*" (emphases added)).  *Cf. Coatesville*, ___ A.3d at ___, slip op. at 26-27 (suggesting no impact exists because the threshold is *de facto* neutral).

For example, government policies that classify properties by neighborhood or type, *e.g.*, commercial, residential, or industrial, are unconstitutional.  *GM Berkshire Hills II*, 290 A.3d at 251-52 (citing *Valley Forge*, 163 A.3d at 978, and *Clifton v. Allegheny Cnty.*, 969 A.2d 1197 (Pa. 2009)).  Such policies are unconstitutional because they raise the specter of "discrimination by local officials among similarly situated property owners who are underrepresented in the general population," *e.g.*, the very rich or very poor.  *Id.* at 252 (quoting *Lionville II*, 913 A.2d at 201).  Critically, the *Lionville II* Court "never suggested that the *government* could divide the realty within a taxing district into multiple sub-classifications and either apply disparate assessment ratios to the different sub-classifications, or *otherwise systematically treat them differently*."  *Valley Forge*, 163

---

[3] *Accord Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 913 A.2d 194, 200 (Pa. 2006) (*Lionville II*).

A.3d at 973 (first emphasis in original).[4]

Yet, the majority sanctions the government's classification of realty via a monetary threshold. I respectfully disagree. *See GM Berkshire Hills*, 290 A.3d at 253 n.5 (Donohue, J., opinion in support of reversal) (opining that such "thresholds could easily serve as methods of circumventing our holdings in cases such as *Clifton* and [*Valley Forge*], as they could be set at amounts that would largely target only certain neighborhoods (*i.e.*, those known to contain more expensive homes), property uses (large apartment buildings vs. small single-family homes), or types (commercial versus residential). Under both *Clifton* and [*Valley Forge*], such pretextual thresholds would run afoul of the Uniformity Clause, regardless of whether they were intentionally created"). *Compare id.*, *with* Notes of Testimony (N.T.), 10/13/22, at 21-22 (reflecting agreement by a government witness that the "average taxpayer probably doesn't pay $10,000" of property tax and that the threshold *only* targets "commercial properties and very high-end residential properties").

I perceive no principled distinction between the government (1) selecting only "commercial properties and very high-end residential properties," N.T. at 21-22, and (2) selecting a "facially property-type-neutral" monetary threshold that self-selects only those properties. *See Coatesville*, ___ A.3d at ___, slip op. at 4, 26. The *Coatesville* majority holds the latter is "facially fair and neutral." *Id.* at 26. The latter is constitutional, the majority reasons, because it applies to "underassessed properties of all types," and thus, no subclassification of property occurs. *Id.*

---

[4] *Accord Narehood v. Pearson*, 96 A.2d 895, 899 (Pa. 1953) (stating that the "intentional, systematic undervaluation by state officials of taxable property of the same class belonging to other owners contravenes the constitutional right of one taxed upon the full value of his property").

LAD - 4

Although the majority's reasoning is facially appealing, I submit that the majority fails to adequately consider how the government's policy *creates* an impermissible subclass: properties that could generate at least $10,000 of tax revenue. *See GM Berkshire Hills II*, 290 A.3d at 253 n.5 (Donohue, J., opinion in support of reversal) (stating that "blanket allowance of rigid monetary thresholds could violate uniformity, while general allowance would require courts to constantly draw lines based upon whether the record demonstrates that the monetary threshold is a mere pretext, either by design or in its impact"); *Valley Forge*, 163 A.3d at 980. In other words, owners of "commercial properties and very high-end residential properties" are members of a class targeted *solely* for their membership in that class. *See GM Berkshire Hills II*, 290 A.3d at 255 (Donohue, J., opinion in support of reversal).

In addition to endorsing the government's *de facto* property classification, in my view, the majority does not sufficiently address the obvious *impact* of its holding: underassessed properties *below* the monetary threshold will shoulder a *less* proportionate tax burden than underassessed properties *above* the monetary threshold. *See GM Berkshire Hills II*, 290 A.3d at 254 (Donohue, J., opinion in support of reversal). *Cf. Clifton*, 969 A.2d at 1222 (rejecting a tax policy that negatively impacted "owners of properties in lower-value neighborhoods where property values often appreciate at a lower rate than in higher-value neighborhoods, if they appreciate at all"). The impact necessarily derives from the government's policy of targeting *only* underassessed properties that could generate at least $10,000 of additional tax revenue. But the Uniformity Clause prohibits favoritism.

## B.

Further, under the majority's analysis, it appears we must also endorse

a policy that targets properties that could generate at least $100 or $100,000 of additional tax revenue, albeit subject to one limiting principle: the factfinder's credibility determination.[5]  If the factfinder finds that the government witness credibly testified that the threshold was the result of a bona fide cost-benefit analysis, then we must sanction the government's monetary threshold—*even if* the policy's impact results in *de facto* discrimination.  In other words, per the majority, a very high (or low) facially neutral monetary threshold could be constitutional even if the result is *only* properties within "lower-value" or "higher-value neighborhoods." *See Clifton*, 969 A.2d at 1222.

Perhaps recognizing the absence of any other limiting principles (except credibility), the majority posits that courts may consider whether the government's *implementation* of a threshold results in an arbitrary and capricious selection of properties.  *Coatesville*, ___ A.3d at ___, slip op. at 35-36.  In the majority's view, courts could consider the "totality of the circumstances" based on the "unique facts of each case," including, presumably, credibility.  *Id.* at 36.  Thus, I suggest the majority's analytical framework compels the following corollaries.

First, the exact same monetary threshold will result in different outcomes, depending on the factfinder's credibility rulings and how the government implements the threshold.  For instance, if the government's implementation of the threshold results in a single property, then we must accept differing outcomes, *i.e.*,

---

[5] *Compare Coatesville*, ___ A.3d at ___, slip op. at 31 (deferring to the trial court's credibility determination in holding "that a bona fide cost-benefit analysis, based on [the government witness's] more than three decades of experience, led to the adoption of the $10,000 monetary threshold"), *with* N.T. at 19 (agreeing with counsel's question that he did *not* "conduct any independent analysis to arrive at that threshold for Coatesville, right? It was simply based on your prior experience?").  Even if a witness actually conducted an independent analysis, I question whether the credibility of a witness's testimony should be the sole determinative factor on the constitutionality of a monetary threshold. *See GM Berkshire Hills II*, 290 A.3d at 252 (Donohue, J., opinion in support of reversal).

the trial court finding the government witness credible (or not credible) in targeting the property. Second, minute differences in the threshold are meaningless, all else being equal. For example, take the case at bar, but assume a $10,001 threshold and the factfinder finds the government witness not credible. Respectfully, I am not persuaded that we can constitutionally harmonize such differing outcomes even if the government's implementation was reasonable. *See GM Berkshire Hills II*, 290 A.3d at 253 n.5 (Donohue, J., opinion in support of reversal) (observing that courts would be tasked with drawing "lines based upon whether the record demonstrates that the monetary threshold is a mere pretext, either by design or in its impact").

## C.

Further, the government's witness, in identifying qualified properties, used the common level ratio (CLR). *See, e.g.*, N.T. at 64-65 (agreeing that he used the ratio to calculate values), 75-76, 87-88 (reflecting testimony from the government's witness that he only looked at residential properties listed for sale or sold in the last three to five years and multiplied them by the CLR).[6] But CLR "is *not* indicative of uniformity." *Clifton*, 969 A.2d at 1216 (emphasis added); *GM Berkshire Hills II*, 290 A.3d at 258 (Dougherty, J., opinion in support of reversal).[7]

---

[6] The witness also testified that he used a different methodology for commercial properties. N.T. at 88; *see also Coatesville*, ___ A.3d at ___, slip op. at 7-8. It remains unclear to me why the government using one methodology to select qualifying residential properties and a different methodology to select qualifying commercial properties is constitutional merely because the threshold is facially neutral. *See Valley Forge*, 163 A.3d at 977 (holding that the government's policy of selecting only commercial properties to appeal violates the Uniformity Clause). The majority rejects out of hand any suggestion that the government acted improperly by considering a particular type of underassessed commercial properties. *Coatesville*, ___ A.3d at ___, slip op. at 37.

[7] *Accord Lionville II*, 913 A.2d at 201 (explaining that CLR "yields substantial leeway for potential discrimination by local officials among similarly situated property owners who are underrepresented in the general population, given both the significance of range in the application of averages . . . , and the fact that under-representation in a surveyed population yields diminished impact on resultant averages" (citations omitted)).

CLR is not indicative of uniformity because it only reflects properties that were sold.[8] *GM Berkshire Hills II*, 290 A.3d at 254 (Donohue, J., opinion in support of reversal), 258 (Dougherty, J., opinion in support of reversal); *Downingtown Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 819 A.2d 615, 624 (Pa. Cmwlth. 2003) (*Lionville I*) (*en banc*) (Friedman, J., dissenting), *rev'd*, *Lionville II*. Regardless, even if CLR was not flawed, using CLR "to select properties for appeal" is inherently discriminatory: "the members of the sub-class are aware that they alone have been targeted for scrutiny solely due to their membership in the sub-class; moreover, they alone must bear the costs of defending against the appeal and of any follow-up litigation in court . . . ." *GM Berkshire Hills II*, 290 A.3d at 255 (Donohue, J., opinion in support of reversal) (citation omitted). To be clear, I agree with the reasoning by all of the *GM Berkshire Hills II* Justices in their opinions in support of reversal.

### III.

Third, our Supreme Court has held that similar taxes with legislated monetary thresholds violated the Uniformity Clause. For example, in *In re Cope's Estate*, 43 A. 79 (Pa. 1899) (*Cope*), our Supreme Court held unconstitutional an inheritance tax that applied only to estates worth more than $5,000. *Cope's*, 43 A. at 83. In explaining why the estate tax violated the Uniformity Clause, the *Cope's* Court reasoned that as "to classification, it is very clear that $5,000 in value of the

---

[8] Generally, in assessing properties, the taxing authority assesses *all* properties: sold *and* unsold properties. *Appeal of Armco, Inc.*, 515 A.2d 326, 329 (Pa. Cmwlth. 1986) (*en banc*). If the taxing authority did not assess owners of unsold properties, then such owners could improve their properties without a change in assessed values. *See id.* Thus, the government's use of recently listed or sold residential properties would not capture unsold, potentially improved residential properties that would exceed the threshold. *See* N.T. at 75-77 (reflecting testimony by government's witness that he did not review unsold residential properties for the last three to five years and thus did not know whether any unreviewed properties would have met the threshold); *see also Coatesville*, ___ A.3d at ___, slip op. at 7.

personal property specified in the act is precisely the same in kind as $50,000 (or any other sum) in value of said property." *Id.* "The money value of any given kind of property," our Supreme Court held, "*can never be made a legal basis* of subdivision or classification for the purpose of imposing unequal burdens on either of such classes, or wholly exempting either of them from any burden." *Id.* (emphasis added); *see generally Nextel Commc'ns of Mid-Atl., Inc. v. Com. of Pa., Dep't of Revenue*, 171 A.3d 682, 694-98 (Pa. 2017) (*Nextel*). The *Nextel* Court reiterated that for "over a century, our Court has steadfastly adhered to an interpretation of the Uniformity Clause that classifications based solely upon the quantity or *value* of the property being taxed are arbitrary and unreasonable, and, hence, forbidden." *Nextel*, 171 A.3d at 696 (emphasis added and citations omitted).

The *Nextel* Court also discussed another tax that our Supreme Court invalidated as unconstitutional. *Id.* at 699-700 (discussing *Mt. Airy #1, LLC v. Pa. Dep't of Revenue*, 154 A.3d 268 (Pa. 2016) (*Mt. Airy*)). Per *Nextel*, in *Mt. Airy*, our Supreme Court addressed a tax that classified taxpayers into two groups: (1) taxpayers earning less than a particular monetary threshold paid a flat tax amount; and (2) taxpayers earning more than the threshold paid a percentage tax. *Id.* The *Mt. Airy* Court reasoned that the tax violated the Uniformity Clause because it resulted in "one group with income above a certain level paying a higher tax rate than the other group with income below that level." *Id.* Thus, per *Nextel*, courts have held unconstitutional taxes that purport to reflect a facially neutral, quantitative monetary threshold, *i.e.*, monetary *value* of property, including taxes that exempt property *below* a monetary threshold (such as less than $10,000). *See id.*

In the case at bar, and akin to the taxes discussed in *Nextel*, the monetary threshold exempts taxpayers whose properties could not generate an additional

$10,000 in tax revenue. *See Nextel*, 171 A.3d at 696, 699.[9] In other words, the threshold applies *only* to taxpayers whose properties *exceed* a certain monetary value, *i.e.*, could potentially generate an additional $10,000 in tax revenue. Similar to the *Mt. Airy* tax, the instant $10,000 threshold divides property owners into two groups: (1) taxpayers whose assessments, if successfully challenged, would result in less than $10,000 of tax revenue, and thus their tax remains unchanged; and (2) taxpayers whose assessments, if successfully challenged, would result in more than $10,000 of tax revenue, and thus pay more than the other group. *See id.* at 699-700. Using such a monetary figure to classify properties for the purpose of imposing unequal burdens violates the Uniformity Clause. *See id.* at 697, 699-700.[10]

In sum, I discern little constitutional daylight between a legislated monetary amount, *see, e.g.*, *id.*, and the local government's selection of a monetary threshold. At least with the former, it was the product of legislative debate. I submit the latter is subject to the whims of local government officials.

For these reasons, I respectfully dissent. As *Downingtown III* and *GM Berkshire II* signal, our Supreme Court continues to struggle over whether such monetary thresholds are constitutional.[11] With utmost respect, I disagree with the

---

[9] *Compare Nextel*, 171 A.3d at 699 (noting that 98.8% of the taxpayers at issue would not pay the tax at issue), *with* N.T. at 21-22 (conceding that the "average taxpayer probably doesn't pay $10,000" of property tax).

[10] Specifically, the *Nextel* Court discussed, *inter alia*, *Kelley v. Kalodner*, 181 A. 598 (Pa. 1935), in which the legislature had imposed an income tax only on taxpayers whose income exceeded a particular monetary threshold. *Nextel*, 171 A.3d at 697. In holding that such a tax violated the Uniformity Clause, the *Kelley* Court explained that although the legislature's goal of imposing the tax "upon those most able to bear it," "may have been laudable as a matter of public policy," "the principle of inequality involved, if once established, might lead to grossly unfair results in the future." *Id.* (summarizing and quoting *Kelley*). Although these cases address taxes enacted by the legislature, the principles underpinning our Uniformity Clause jurisprudence would appear to apply equally to a case in which the local government has selected a particular threshold.

[11] *Accord In re Lower Merion Twp.*, 233 A.2d 273, 276 (Pa. 1967) (*Lower Merion*) ("No provision in our constitution has been so much litigated yet so little understood; and certainly not

majority's holding that applying a "facially neutral, quantitative" $10,000 monetary threshold does *not* result in an unconstitutional, impermissible subclass of property. In my view, it does: the practical *impact* of the government's policy results in disparate treatment. Further, I submit that the majority insufficiently scrutinizes and balances (1) the government's alleged cost-benefit justification, with (2) the costs to the taxpayer of defending against an assessment appeal. Additionally, in my view, the government erred by using CLR to implement its policy. Finally, other than credibility, there appears to be no other limiting principles in the initial step of the majority's analytical framework. I recognize that rough—not perfect—uniformity is the goal. However, the government cannot discriminate in reaching for the goal.

 

 

_____
LORI A. DUMAS, Judge

Judge Wallace joins in this Dissenting Opinion.

---

the least thorny question has been whether real estate as a whole constitutes a class which cannot be further broken down for tax purposes. To put to rest some of this confusion, we hold today that real estate as a subject for taxation may not validly be divided into different classes."); 2 Wade J. Newhouse, Const. Uniformity & Equality in State Tax'n 1199-1435 (2d ed. 1984) (tracing evolution of Pennsylvania's Uniformity Clause jurisprudence). The *Lower Merion* Court invalidated an assessment that could either "be interpreted as [(1)] a classification of real estate into categories such that one category, unoccupied or unconveyed residential property, is not subject to interim assessments, or [(2)] whether they be treated as simply exempting such property from otherwise permissible interim assessments . . . ." *Lower Merion*, 233 A.2d at 275.